# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### April 13, 2021 Session

## STATE OF TENNESSEE v. VINCENT PARKER LEE

**Appeal from the Circuit Court for Macon County**
**No. 07-132     Brody Kane, Judge[1]**

---

### No. M2020-00572-CCA-R3-CD

---

Aggrieved of his convictions of rape of a child, aggravated sexual battery, and incest, the defendant, Vincent Parker Lee, appeals.  In this appeal, the defendant asserts that the evidence was insufficient to support his convictions of rape of a child; that the trial court erred by permitting the State to ask leading questions of the child rape victim; that the State's failure to make an election of offenses at the close of its case-in-chief resulted in plain error; that the cumulative effect of the alleged errors deprived him of the right to a fair trial; and that the trial court erred by imposing consecutive sentences.  We find no deficiency in the State's proof and no error in either the trial court's ruling with regard to the State's examination of the child rape victim or the consecutive alignment of the sentences.  The State's failure to elect offenses at the close of its case-in-chief was error, but, because the error can be classified as harmless beyond a reasonable doubt, it does not rise to the level of plain error.  Consequently, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and CAMILLE R. MCMULLEN, J., joined.

Brennan M. Wingerter, Assistant Public Defender (on appeal); and Tom Bilbrey, Assistant District Public Defender (at trial), for the appellant, Vincent Parker Lee.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Tommy Thompson, District Attorney General; and Tom Swink and Justin Harris, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1] The Honorable David E. Durham presided over this case until his retirement.

# OPINION

The Macon County Grand Jury charged the defendant with five counts of rape of a child and five counts of incest for acts of abuse committed against his step-daughter, J.M., and his daughter, T.M.[2]

At the September 8, 2009 trial, T.L., the victims' mother testified that the defendant, her ex-husband, was T.M.'s father and J.M.'s step-father and that the couple also shared a son, S.L. In 2007, the family lived in Macon County. In June of that year, J.M. "came to me and told me that she was molested by my husband." T.L. confronted the defendant with J.M.'s allegations when he returned home from work, saying that when he pulled into the driveway of the family home, she "ran to the truck and pulled him out of the truck and was hitting him and pushing him." T.L. told the defendant "what [J.M.] had told me, and he said he didn't want to hear it from me, he wanted to hear it from her." The defendant and T.L. went inside, and T.L. encouraged J.M. to tell the defendant what she had previously told T.L. T.L. testified that J.M. repeated the allegations, and the defendant "kept saying, no, I didn't do that, I didn't do that. And she said; yes, you did. And he said, well, if I did do that, then why didn't you stop me, why didn't you say something." T.L. said that J.M. told the defendant that "she was scared he would hurt [her] some more." T.L. recalled that, at that point, the defendant began to cry and say that he "couldn't have done that." The defendant then "commenced to begging me to kill him." T.L. said that she told the defendant to "just get out," and he "asked me if we could go to counseling to get help." T.L. testified that she "told him, no, and I kicked him in his chest and he fell on the ground and I was hitting him some more and kicking him some more." The defendant left, and T.L. went into the residence to lie down with the victim.

T.L. testified that, on the following morning, she "commenced to calling doctors, hospitals, Health Department to ask for a rape kit" and was told that she should call the sheriff's department. T.L. said that she telephoned the sheriff's department. T.L.'s grandmother drove T.L. and her daughters to the sheriff's department. After questioning the girls, an officer drove J.M. and T.M. "to get the rape kits done."

T.L. recalled that S.L. broke his arm on February 11, 2007, and that he spent the night in the hospital as a result. T.L. stayed at the hospital with S.L. while the defendant stayed home with J.M. and T.M.

Nine-year-old J.M. testified that, at one time, she lived with her mother, father, sister, and brother in Tennessee and that she lived in Florida at the time of trial.

---

[2]  As is the policy of this court, we refer to the victims of sexual offenses by their initials. In keeping with our goal of protecting the anonymity of the victims, we also refer to their mother and brother by their initials.

J.M. said that she referred to her breasts as "[p]epparonis," her buttocks area as her "tush," and her genital area as her "monkey." J.M. testified that the defendant touched "[m]y monkey and my tush" on the night that T.L. was at the hospital with S.L. after S.L. broke his arm. After saying that it was "kind of hard to" describe how the defendant had touched her, she said that "[h]e stuck his hand inside my underwear" and "was touching me" "[o]n my monkey and my tush." She said that she knew that the defendant had touched her inside her "monkey" because she "felt it." J.M. testified that the defendant also touched her with his penis, saying, "He put his thing in my underwear." She said that she felt the defendant's penis inside her "monkey." Eventually the defendant "stopped and he fell asleep."

J.M. testified that the defendant touched her on another occasion in her bedroom when the family lived "in the house that my brother broke his arm in." She explained, "He put his hand in my underwear and he was touching me and then he stopped and he went in his room and fell asleep. I was scared. I turned around and then I laid down and fell asleep." J.M. confirmed that the defendant had put his hand under her "nighties" and had touched her skin. She said that he "just put his hand on" her tush "and then took it off."

J.M. testified that on yet another occasion, the defendant "put his hand in my underwear under my nightie" and touched her "monkey" with his fingers. She said that the defendant's finger went inside her "monkey" "only once." J.M. said that she knew that the defendant's finger had gone inside her vagina because she "felt it." J.M. reported that the defendant touched her "every night" and that she "would just lay there and be still." J.M. said that she disclosed the abuse to her mother and that her mother "packed all his stuff and put it outside."

During cross-examination, J.M. clarified that the two particular incidents when the defendant penetrated her vagina took place "before and when" S.L. "broke his arm, and after that, whenever I told my mom, that was inside a trailer after my brother broke his arm."

Seven-year-old T.M. testified that on one occasion when she lived with her mother, father, sister, and brother in a trailer in Tennessee, she awoke to find the defendant "tapping on" her "chochee," which was her name for her genital area, with "[h]is finger." She said that the incident occurred after her brother broke his arm.

Macon County Sheriff's Department Detective Bill Cothron testified that he and Detective Danny Fisher investigated the allegations against the defendant. He interviewed the defendant on June 7, 2007. The video recording of the interview was played for the jury. The defendant was placed in a holding cell following the interview while Detective Cothron discussed the case with Detective Fisher, DCS Case Manager

Samantha Davis Britton, and Sumner County Sheriff's Department Detective Tim Bailey. Following that discussion, Detective Cothron interviewed the defendant a second time just after midnight on June 8, 2007. A video recording of that interview was also played for the jury. In the recordings, the defendant acknowledged having touched J.M. and T.M. as they described.

During cross-examination, Detective Cothron conceded that he was aware that the defendant had been to the emergency room and transferred to Moccasin Bend Mental Health Institute ("Moccasin Bend") early in the day on June 7, 2007. He agreed that the defendant had indicated at several points during the interrogation that he had no memory of the alleged offenses. He did wake the defendant for the second interview, which occurred after midnight.

Following Detective Cothron's testimony, the State rested. The trial court granted the defendant's motion for judgment of acquittal and directed a verdict in his favor on Counts 4, 5, 9, and 10, which counts alleged child rape and incest of T.M., but denied the defendant's motion for judgment of acquittal on the remaining counts. The defendant elected to testify.

The 31-year-old defendant testified that he married T.L. in May 2003 and that the family moved to Tennessee in January 2007. The defendant said that when T.L. confronted him about "a statement that [J.M.] had made to her about me touching her," he "told her, I don't remember. I don't recall something like that happened." The defendant said that he "was just devastated" and "overwhelmed at the fact of what was said," so he went to the hospital at approximately 3:00 a.m. He told the workers at the hospital that he "was being attacked spiritually from the enemy, the devil, you know, and he was using certain things against me to try to get me to take my life."

The defendant testified that he told hospital personnel that he was "hearing voices," so they gave him "a shot" "to help relax . . . and stop those voices." He said that the shot "really doped me up." Thereafter, a police officer transported him to Moccasin Bend in Chattanooga. The defendant could not recall what time he arrived at Moccasin Bend because he "was really in and out of it because of that medicine." After a brief evaluation, the defendant was released, and the police officer took him back to the hospital in Macon County.

The defendant testified that, when he arrived at the hospital, he got into his car and returned to the family residence. Shortly after he arrived home, a different police officer arrived and transported him to the sheriff's office, where he was placed in a holding cell. The defendant maintained that he had no independent recollection of the first interview with Detective Cothron and that he only remembered "bits and pieces" that had

"come back to my mind from watching the video." The defendant said that, during the interrogation, he "felt overwhelmed" and "weak. I felt mentally drained. I felt scared." He said that the detectives yelled at and threatened him. The defendant acknowledged having made incriminating admissions, particularly during the second interview, but he attributed those admissions to his "mental state of confusion." He claimed that he told the detectives "what they wanted to hear" because he believed that they would help him and because he "just wanted to get this over" so that he could "go home." He insisted that he did not commit any of the charged offenses and that he only confessed "[b]ecause my mind was weakened and my physical state was exhausted and I wanted it over with. I said what would end it." He explained that he "wanted the help that they were offering me," saying that he thought the officers "were going to help me find out what was really going on with me, with my family, that they were going to help me go back home."

During cross-examination, the defendant testified that he did not believe that J.M. lied when she said that he "touched her" but that "she was used by a lie." He explained, "I told you earlier, the enemy is out to get each and every one of us. He's going to use whoever and whatever he can to destroy us." The defendant said that the allegations were "put in her head" and in his head "by the same enemy." As to his confession, he said that the detectives "pointed towards certain things and I guess I went with the rest of it." The defendant claimed that he realized that the allegations and his admissions were false "[w]hen the truth started being represented to me." He explained that, after he was incarcerated, he "grew longer in the word and I started to walk with God and listening and deciphering the two voices that go on inside each and every one of us, I started telling the difference between the devil's voice and his lies and God's truth." The defendant said that, at that point, he "started to realize that [the devil's] lying, that he's always been a liar and he's going to use the most convincing effects."

The defendant testified that he had previously been committed to the hospital "three or four times for psychological problems." He said that he heard voices telling him to commit suicide and that the injection given to him at the hospital "suppressed [the voices] to a point where they weren't as forceful." He added, "I believe that the devil is trying to put me away because he's terrified of the fact that I can make a difference in God's world." He maintained that "the only thing that I'm guilty of is not knowing how to stand against something that's so evil and destroying."

Based upon this evidence, the jury convicted the defendant as charged in Counts 1 and 2 of the rape of J.M. and Counts 6 and 7 of incest with J.M. In Count 3, the jury acquitted the defendant of the rape of T.M. but convicted him of the lesser included offense of aggravated sexual battery. The jury acquitted the defendant of incest with T.M., as charged in Count 8.

Following a sentencing hearing, the trial court imposed sentences of 25 years for each of the defendant's convictions of rape of a child and a sentence of 12 years for his conviction of aggravated sexual battery, all of which sentences must be served at 100 percent by operation of law, and ordered that they be served consecutively. The court imposed sentences of six years for each of the defendant's convictions of incest and ordered that they be served concurrently with the coordinating child rape convictions. The total effective sentence is, therefore, 62 years.

The defendant filed a timely motion for new trial on December 2, 2009. For reasons that do not appear in the record, no further action occurred until the filing of an amended motion for new trial on February 6, 2020. Judge Brody Kane, who replaced original trial Judge David E. Durham, held a hearing on the motion on February 7, 2020, and issued a written order denying the motion on February 21, 2020. The defendant filed a timely notice of appeal. In this appeal, the defendant challenges the sufficiency of the convicting evidence for his convictions of rape of a child, the trial court's ruling with regard to the State's examination of J.M., the State's failure to make an election of offenses, and the sentencing decision of the trial court. He also contends that the cumulative effect of the alleged errors deprived him of the right to a fair trial.

## I. Sufficiency

The defendant challenges the sufficiency of the convicting evidence for his convictions of rape of a child, arguing that the State failed to establish the element of penetration.[3] The State asserts that the evidence was sufficient.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

---

[3]  The defendant does not challenge the sufficiency of the evidence supporting his conviction of the aggravated sexual battery of T.M.

"Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim" if the victim is between the ages of three and 13. T.C.A. § 39-13-522(a) (2006). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7).

In this case, nine-year-old J.M. testified that the defendant, her step-father, put his penis and finger inside her "monkey," her euphemism for vagina, on the night that S.L. broke his arm and had to spend the night in the hospital. T.L. testified that S.L. broke his arm on February 11, 2007. J.M. said that she knew the defendant had placed his finger and penis inside her "monkey" because she had "felt it." J.M. testified that on an occasion before S.L. broke his arm, the defendant "put his hand in my underwear under my nightie" and touched her "monkey" with his fingers. She said that she knew that the defendant's finger penetrated her vagina because she "felt it." In our view, this evidence was sufficient to establish the element of penetration.

## II. Examination of J.M.

The defendant next challenges the trial court's allowing the prosecutor to lead during the direct examination of J.M. and argues that the prosecutor's leading questions, combined with his inaccurate characterization of J.M.'s answers to some questions, planted ideas in J.M.'s head. The State contends that the examination was appropriate and that the trial court did not err by allowing the prosecutor some leeway in questioning the nine-year-old victim.

Because Tennessee Rule of Evidence 611 vests the trial court with wide discretion in controlling the presentation of evidence, *see* Tenn. R. Evid. 611(a), we review this decision concerning the presentation of evidence under an abuse of discretion standard, *see State v. Caughron*, 855 S.W.2d 526, 540 (Tenn. 1993). Generally, "[a] trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

Rule 611 permits the use of leading questions during direct examination when "necessary to develop the witness's testimony." Tenn. R. Evid. 611(c)(1). This court has specifically held that a trial court does not err by permitting leading questions of child sex offense victims on direct examination when necessary to fully develop the witness's testimony. *Swafford v. State*, 529 S.W.2d 748, 749 (Tenn. Crim. App. 1975). The trial

court overruled the defendant's objection to the prosecutor's leading J.M., stating that it was "allowing a lot of latitude on the way they're questioning . . . given the fact that we've got a nine year old." Indeed, J.M., who was nine-years-old at the time of trial, clearly had difficulty answering questions, often offering non-verbal answers. She said on more than one occasion that it was "kind of hard to" describe how the defendant had touched her. As evidenced by the euphemisms she used to identify the parts of the body, J.M. lacked the language to fully describe the defendant's assault. Under these circumstances, the trial court did not err by permitting the prosecutor to lead J.M.

Additionally, the prosecutor's questions did not amount to a gross mischaracterization of her earlier testimony as the defendant claims. After saying that it was "kind of hard to" describe how the defendant had touched her, J.M. said that "[h]e stuck his hand inside my underwear" and "was touching me" "[o]n my monkey and my tush." The prosecutor then asked, "Your monkey and your tush, okay. Now, you said a minute ago, I think, that he touched inside your monkey? Did you say that?" Although J.M. had not specifically said that the defendant had touched "inside [her] monkey," she replied to this question in the affirmative. The questions that followed were a fair characterization of J.M.'s earlier testimony that the defendant had touched inside her "monkey" and "tush" with his hand "inside my underwear":

> Q. Now, how did you know that he was touching you inside your monkey?
>
> A. I felt it.
>
> Q. You felt it, okay. Now, you said he used his hand; is that right?
>
> A. U-huh (affirmative).
>
> Q. Did he use a finger?
>
> A. Uh-huh (affirmative).
>
> . . . .
>
> Q. And he put it inside your monkey?
>
> A. Yes.
>
> Q. Now, did he do anything else to you?

A. (Witness nods her head up and down.)

Q. You're nodding yes. Remember, go ahead and say yes if he did.

A. Yes.

Q. He did, all right. Well, let's talk about that for a minute, okay. Your daddy has private parts, too, right?

At that point, J.M. said that she called the defendant's penis "his thing" and that she had never seen it but that he had touched her with it. She said, "He put his thing in my underwear." The prosecutor then attempted to clarify:

Q. And did he touch your monkey with his thing?

A. Yes.

Q. He did?

A. Yes, sir.

Q. Did he touch inside your monkey with his thing?

A. Yes, sir.

Q. Okay, [J.M.] how did he do that? How did you know that his thing was inside your monkey?

A. I felt it.

Q. You felt it, all right. What did you do then?

A. I was scared so I just laid there.

In our view, the prosecutor's questions were a fair restatement of J.M.'s earlier answers and were designed to clarify her testimony rather than "plant ideas" in her head.

## III. Election of Offenses

The defendant next contends that he is entitled to a new trial because the State committed plain error when it failed to make an election of offenses at the close of its case-in-chief. The State argues that the defendant waived plenary review of this issue by failing to object at trial or raise the issue in his motion for new trial and that he cannot establish entitlement to relief via review for plain error.

The indictment charged the defendant with two counts of rape of a child and two counts of incest for acts committed against J.M. Count 1 alleged an offense occurring "on or before June 7, 2007," and Count 2 alleged an offense occurring "between February 1, 2007 and June 6, 2007." J.M. testified that the defendant touched inside her vagina with his finger and his penis on the day that S.L. broke his arm. T.L. testified that S.L. broke his arm on February 11, 2007. J.M. testified that, on an occasion before S.L. broke his arm, the defendant touched inside her vagina with his finger. She also testified that, on another occasion, the defendant touched her buttocks and that he touched her "every night" and that she "would just lay there and be still."

When the evidence adduced at trial indicates that the defendant has committed more offenses against the victim than were charged in the indictment, the State must elect the offense upon which it intends to rely for each count of the indictment in order to protect "the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence."[4] *State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001); *see also State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999); *State v. Walton*, 958

---

[4]     Our prior decisions with regard to juror unanimity are moored in state constitutional law because, until very recently, the Supreme Court had not concluded that the Sixth Amendment right to a jury trial as incorporated via the 14th Amendment required a unanimous jury verdict. In *Ramos v. Louisiana*, however, the Court concluded:

> There can be no question either that the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally. This Court has long explained that the Sixth Amendment right to a jury trial is "fundamental to the American scheme of justice" and incorporated against the States under the Fourteenth Amendment. This Court has long explained, too, that incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government. So if the Sixth Amendment's right to a jury trial requires a unanimous verdict to support a conviction in federal court, it requires no less in state court.

*Ramos v. Louisiana*, 590 U.S. ____, 140 S. Ct. 1390, 1397 (2020) (citations omitted).

S.W.2d 724, 727 (Tenn. 1997). The election requirement arises most often when a defendant is alleged to have performed multiple sexual acts over a lengthy period of time against young children who are unable to provide the exact date on which any one act occurred. *See, e.g.*, *Johnson*, 53 S.W.3d at 631; *Brown*, 992 S.W.2d at 391-92. Our supreme court has held that when an "indictment charges that sex crimes occurred over a span of time, evidence of unlawful sexual contact between the defendant and the victim allegedly occurring during the time charged in the indictment is admissible," but the State "must elect at the close of its case-in-chief the particular offense for which it is seeking a conviction" in order "to preserve a criminal defendant's right under the state constitution to a unanimous jury verdict" while allowing "latitude in the prosecution of criminal acts committed against young children who are frequently unable to identify a specific date on which a particular offense was committed." *State v. Knowles*, 470 S.W.3d 416, 423-24 (Tenn. 2015) (citations omitted).

The State did not make an election of offenses at the close of its case-in-chief but did differentiate between the offenses during its closing argument:

> Now, let's take this, we have three counts of rape of a child. This [d]efendant is charged with three counts. We have two different victims. . . .
>
> . . . . [J.M.] testified that when her little brother . . . . broke his arm, and . . . the mother, had to take [him] to the hospital, and that left this man at home with little [J.M.] and little [T.M.], and you heard her say what this man did to her.
>
> . . . . This man she called daddy put his finger insider her monkey and put his penis inside her monkey, and she told you that from this stand.
>
> Not only did she tell you that from the stand but you heard him.
>
> You heard [J.M.] talk about two different times that this man did that to her. One time was when [S.L.] broke his arm and she was in his bed. The other time, he came in her room. . . .
>
> She was in bed. She wasn't asleep, and he put his hand on her monkey and he put his hand in her monkey. He used one finger and he penetrated. . . . He stuck his finger in her

-11-

monkey in her bed.

> Now, that's two counts. Remember, two counts of rape of a child against [J.M.]. . . . I want you to remember that when she testified to two. She said it happened many times, but those are the two that I want you to really remember, those two counts of rape of a child.

The defendant did not object to the State's failure to elect offenses at the close of its case-in-chief, did not object to the State's characterization of the offenses in its closing argument, and did not raise the issue in his motion for new trial.

Whether properly assigned or not, however, this court may, "[w]hen necessary to do substantial justice, . . . consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial." Tenn. R. App. P. 36(b). This court will grant relief for plain error only when:

> the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake; that is, the error was so significant that it "probably changed the outcome of the trial."

*State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (quoting *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000)). The party claiming plain error bears the burden of satisfying all five criteria as a prerequisite to plain error review. *See id.* Because each factor must be established, we need not consider all five factors when a single factor indicates that relief is not warranted. *State v. Fayne*, 451 S.W.3d 362, 372 (Tenn. 2014) (citing *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007)). "[A]n error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *Fayne*, 451 S.W.3d at 372 (citation omitted) (alterations in *Fayne*).

"Because the election requirement safeguards a criminal defendant's fundamental, constitutional right to a unanimous jury verdict, errors pertaining to the sufficiency of the prosecution's election are subject to plain error review." *Knowles*, 470 S.W.3d at 424 (citing *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1975); *Kendrick*, 38 S.W.3d at 567; *Walton*, 958 S.W.2d at 726-27 (Tenn. 1997); *State v. Clabo*, 905 S.W.2d 197, 204 (Tenn. Crim. App. 1995)). "When applying plain error review," we are mindful

"that the election requirement is merely a means by which to protect the right to a unanimous verdict. There is no right to a perfect election, and . . . the election requirement may be satisfied in a variety of ways." *Knowles*, 470 S.W.3d at 424. Importantly, "the election requirement applies to offenses, not to the facts supporting each element of the offense." *Id.*

Here, the record clearly indicates what happened in the trial court, the first prerequisite to plain error review. *See Knowles*, 470 S.W.3d at 425. It is clear from the State's closing argument that it considered the two acts of penetration that occurred on the night S.L. broke his arm as a single offense charged as a single count of rape of a child.[5] The trial court, when ruling on the defendant's motion for judgment of acquittal, also classified the three acts of penetration about which J.M. testified as two offenses of rape of a child. The court observed that J.M.

> talked about one incident when her brother broke his arm that she was penetrated with the [d]efendant's penis and finger. Before he broke his arm she testified that the [d]efendant touched her butt, but he's not charged with that.
>
> After he broke his arm, her brother, when they were living in the house, she testified that he put his hand on her vagina and one finger did penetrate her vagina. So as far as the two counts, rape of a child on her, I think there's clearly enough proof.

When the proof is viewed in this light, the State was not required to elect between the different forms of penetration, and jury unanimity is not implicated. *See State v. Keen*, 31 S.W.3d 196, 208 (Tenn. 2000) ("Our research reveals no case, however, in which we have held that the right to a unanimous jury verdict encompasses the right to have the jury unanimously agree as to the particular theory of guilt supporting conviction for a single crime."). "[T]here is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." *Id.* at 209. That being said, the State should have made this clear at the close of its case-in-chief, and its failure to do so arguably "breached a clear and unequivocal rule of law." *Knowles*, 470 S.W.3d at 425. "Viewed in a commonsense fashion and in the context of the trial proof," particularly in light of the State's closing argument, however, the State's failure to make an election at the close of its case-in-chief "did not create a substantial risk of a non-unanimous verdict,

---

[5]     J.M.'s testimony that the defendant touched her on her "tush" does not satisfy the elements of rape of a child and, in consequence, does not implicate jury unanimity. Similarly, J.M.'s statement that the defendant touched her "every night" lacks the specificity necessary to support a conviction for rape of a child and thus presents no unanimity issue.

cause a substantial injustice, or likely change the outcome of the trial." *Knowles*, 470 S.W.3d at 426-27. Under these circumstances, the State's failure to make an election at the close of its case-in-chief "does not rise to the level of plain error which warrants overturning the jury's verdict." *Id.* at 428.

## *IV. Sentencing*

The defendant contends that the trial court erred by ordering partially consecutive sentences without "address[ing] the fact that, by imposing the maximum sentences in Counts 1, 2, and 3, and then running them all consecutive to each other, the total effective sentence of 62 years at 100% was effectively a life sentence." The State avers that the trial court did not abuse its discretion by imposing consecutive sentences.

In determining the sentence length for the defendant's convictions of rape of a child and aggravated sexual battery, the trial court applied enhancement factors 1, that the defendant had a history of criminal convictions or criminal behavior in addition to those necessary to establish the sentencing range; 3, that the offense involved more than one victim; 4, that the victim was particularly vulnerable because of age; 7, that the offense was committed for sexual gratification; and 14, that the defendant abused a position of private trust. *See* T.C.A. § 40-35-114(1), (3), (4), (7), and (14). The trial court applied Code section 40-35-115(b)(5) to align the three top charges consecutively, but ruled that the incest charges should be aligned concurrently, for a total effective sentence of 62 years.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

The standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record

establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013).

As indicated, the trial court imposed consecutive sentences on the ground listed in Code section 40-35-115(b)(5), which provides:

> (b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:
>
> . . . .
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

T.C.A. § 40-35-115(b)(5). The evidence established that the defendant raped J.M., his step-daughter, when she was only seven years old and that he sexually assaulted T.M., his daughter, when she was only six years old. J.M. testified that she was frightened by the assaults and that she did not want to reveal them because she thought the defendant would "hurt her more." In light of this proof, the trial court did not abuse its discretion by imposing consecutive sentences.

## *V. Cumulative Error*

Finally, the defendant asserts that the cumulative effect of the errors at trial deprived him of the right to a fair trial. Having considered each of the above issues and concluded that the defendant is not entitled to relief for any, we need not consider the cumulative effect of the alleged errors. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed . . . .").

## *Conclusion*

Based on the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE